## IN THE UNITED STATES DISTRICT COURT OF MARYLAND

NADINE HOLMES
200 RIDGELY ROAD
GLEN BURNIE, MD 21061

      on her own behalf and on behalf of
      all others similarly situated

          Plaintiffs,

v.

LIVE NATION ENTERTAINMENT, INC.
9348 CIVIC CENTER DRIVE
BEVERLY HILLS, CA 90210

      Serve on:
      CORPORATE CREATIONS NETWORK INC.
      2405 YORK ROAD
      SUITE 201-C
      LUTHERVILLE-TIMONIUM, MD 21093

TICKETMASTER LLC
9348 CIVIC CENTER DRIVE
BEVERLY HILLS, CA 90210

      Serve on:
      CORPORATE CREATIONS NETWORK INC.
      2405 YORK ROAD
      SUITE 201-C
      LUTHERVILLE-TIMONIUM, MD 21093

      Defendant.

Case No. _____

## CLASS ACTION COMPLAINT AND REQUEST FOR JURY TRIAL

Named Plaintiff Nadine Holmes ("Named Plaintiff" or "Holmes"), through her attorneys

Cory L. Zajdel and David M. Trojanowski of Z Law, LLC, and Oren Giskan of Giskan, Solotaroff

& Anderson LLP, brings this action against Live Nation Entertainment, Inc. ("Live Nation") and

1

Ticketmaster LLC (collectively "Ticketmaster") for violations of the *Maryland Consumer Protection Act* ("MCPA"), MD. CODE ANN., COM. LAW § 13-301, *et seq.* In support of her claims, Named Plaintiff states:

## I.    PRELIMINARY STATEMENT

1.    This is a class action lawsuit brought against Defendants for its deceptive and manipulative use of a bait-and-switch scheme commonly known as "drip pricing"[1]—a practice of advertising only part of a product's price and then revealing other charges in a non-initial step in the transaction as the consumer goes through the buying process.

2.    On average, this "drip pricing" model increases the cost of a Ticketmaster ticket between 25% - 50% and in some instances can increase the cost by more than 100% of the face value of the ticket after a non-initial step in the ticket purchase transaction.

3.    Ticketmaster is an online marketplace where consumers can buy and sell tickets for sports, concerts, and other live entertainment events.

4.    Ticketmaster, through its parent company Live Nation, controls over seventy percent (70%) of the market for ticketing and live events, and over eighty percent (80%) of the market for major concert primary ticketing.

5.    As part of Ticketmaster's complete domination over ticketing and live events, Ticketmaster issues tickets for sixty-four percent (64%) of the top grossing amphitheaters and seventy-eight percent (78%) of the top grossing arenas in the United States.

6.    In 2023, Live Nation, through Ticketmaster, retained three billion dollars ($3,000,000,000) in fees on 329 million tickets sold. Live Nation Entertainment 2023 Annual

---

[1] Will Kenton, Drip Pricing: What it Means, How it Works (Jan. 24, 2023), *available at* https://www.investopedia.com/terms/d/drip-pricing.asp (last visited Mar. 21, 2025).

Report     (available     at     https://investors.livenationentertainment.com/sec-filings/annual-reports/content/0001335258-24-000017/0001335258-24-000017.pdf) (last visited Mar. 22, 2025).

7.      In 2024, Live Nation, through Ticketmaster, distributed over 637 million tickets for live events throughout the world. Live Nation Entertainment 2024 Annual Report (available at https://investors.livenationentertainment.com/sec-filings/all-sec-filings/content/0001335258-25-000028/0001335258-25-000028.pdf (last visited Mar. 25, 2025).

8.      Defendant entices consumers to shop for tickets by displaying deceptively low prices that do not include mandatory fees. Only after a consumer has chosen tickets and invested time and effort clicking through an intentionally long, multi-page purchase process does Defendant reveal the mandatory fees added to the ticket price. These mandatory fees associated with Ticketmaster ticket sales are Service Fees, Facility Fees, Order Processing Fees and Taxes ("Mandatory Added Fees").

9.      Ticketmaster displays deceptively low prices to sell more tickets at higher prices.

10.      Ticketmaster understands that deferring disclosure of Mandatory Added Fees is a deceptive practice that is unfair to consumers. Live Nation has explained that "[i]n many instances, deferring disclosure of mandatory fees is inherently deceptive or unfair." Live Nation Comment to Proposed Rule, FTC-2023-0064-3306 (Feb. 7, 2024) (footnote omitted).

11.      For years, Ticketmaster used "drip pricing" on all tickets sold to events taking place throughout the entire country.

12.      Beginning on July 1, 2024, Maryland law explicitly banned "drip pricing" in ticket sales to Maryland residents regardless of where the ticketed event was located and enumerated the exact disclosures required throughout the ticketing purchase transaction. MCPA, § 13-310.1.

13.    On July 1, 2024, Ticketmaster implemented what they refer to as an All-In Pricing model for events taking place in Maryland but retained the "drip pricing" model in most other states.

14.    Nonetheless, even with this so-called All-In Pricing model, Ticketmaster has refused to conform its ticket sales practices to eliminate "drip pricing" for Maryland consumers and continues to fail to disclose Mandatory Added Fees in the initial step in the transaction.

15.    And Ticketmaster has no rational basis for failing to disclose all Mandatory Added Fees up front as part of an "all-in-pricing" model. Ticketmaster has already acknowledged that "[t]echnologically, it is no more difficult for [a] ticketing company to show the all-in price throughout the shopping and purchasing experience than it is to show it only at checkout." Live Nation Comment to Proposed Rule, FTC-2023-0064-3306 (Feb. 7, 2024) (footnote omitted).

16.    Indeed, Ticketmaster includes some of the Mandatory Added Fees to customers when the event is scheduled to occur in certain states—showing that Ticketmaster is capable and has its own systems set up to display pricing up front instead of deceptively hiding it at the end. Nonetheless, depending on the location of the event, regardless of where the consumer shops, Ticketmaster still uses partitioned pricing where the true amount of the tickets (inclusive of fees) is not disclosed until the end of the transaction. This means that, despite the recent wave of states that have passed anti-hidden fee laws, Ticketmaster in many instances, chooses to advertise a deceptively low initial price to residents of those states, surprising consumers with mandatory junk fees.

17.    To make matters worse, Ticketmaster uses a countdown clock to create a false sense of investment and urgency for consumers and to distract from and obfuscate the fact that the total purchase price at checkout is significantly higher than originally advertised.

18.     This "drip pricing" model is, and has always been, a deceptive trade practice that violates MCPA.

19.     For this reason, Named Plaintiff seeks relief in this action individually, and on behalf of all other ticket purchasers in the state of Maryland that used the Ticketmaster Website or Ticketmaster App to purchase tickets for events that Ticketmaster utilized drip pricing, for actual damages, reasonable attorneys' fees and costs.

## II.     PARTIES

20.     Named Plaintiff Nadine Holmes is a natural person and is a resident of the state Maryland (Anne Arundel County).

21.     Defendant Live Nation Entertainment, Inc. is incorporated under the laws of the State of Delaware, with its principal place of business in Beverly Hills, California.

22.     Defendant Ticketmaster LLC is a limited liability company registered under the laws of the Commonwealth of Virginia, with its principal office located in Beverly Hills, CA. Ticketmaster is a wholly owned subsidiary of Live Nation.

23.     Live Nation and Ticketmaster own and operate the websites http://www.livenation.com and http://www.ticketmaster.com (collectively "Ticketmaster Website") and the Live Nation and Ticketmaster smartphone applications (collectively "Ticketmaster App"). Ticketmaster is the ticketing business of Live Nation.

## III.    JURISDICTION AND VENUE

24.     This Court has original subject matter jurisdiction over this case pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs, the number of class members

exceeds one hundred (100), and minimal diversity exists because many class members, including some Plaintiffs, have different citizenships from the Defendants.

25.    This Court has personal jurisdiction over Defendants because Defendants have purposefully availed themselves of the laws, rights, and benefits of the State of Maryland. Each Defendant has engaged in activities including promoting live concerts in Maryland, operating venues in Maryland, systematically and continually transacts business in Maryland, and the case arises, out of a transaction that took place within Maryland, and Defendant contracts to supply goods or services in Maryland.

26.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District and the harm caused to Plaintiff and the Class Members occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### A. Drip Pricing

27.    "Drip pricing" is a type of bait-and-switch pricing method that refers to the practice of advertising only part of a product's price upfront and revealing Mandatory Added Charges later as consumers go through the buying process.

28.    Behavioral economists generally concur that "drip pricing" leads consumers to overpay by exploiting individuals' inclination to complete a commenced purchase.[2] By enticing individuals into a transaction with an artificially low price, a website or application designer can instill a sense of commitment from the consumer to the transaction. By compelling the consumer to navigate through multiple screens, the website designer compels the consumer to invest time

---

[2] Steffen Huck & Brian Wallace, The impact of price frames on consumer decision making: Experimental evidence, at 1-3 (Oct. 15, 2015).

into the transaction. After a seller has introduced surprise fees on the final screen, assuming the consumer even perceives the fees, the consumer will still be hesitant to depart due to a perception of potential loss by abandoning the transaction.

29.    Consumers who are not provided the complete price until checkout are likely to proceed with their purchase even after the junk fee is revealed because they have already factored the deceptively low price into their decision and built purchasing commitment as they clicked through the transaction. Because of Ticketmaster's deceptively low advertised prices, which do not include fees, and because the process of clicking through the transaction builds purchasing commitment, consumers proceed with the transaction even after exorbitant and unpredictable fees have been added despite their better judgment—and despite the fact that continuing to search for cheaper prices would be more "optimal"—because consumers want to avoid "the cost of the time and cognitive effort involved" in continuing to search for a product or service.[3]

30.    Indeed, as companies that engage in junk fee practices are aware, consumers choose products or services based on the advertised "base price," and not based on the price inclusive of fees, which is obscured by partitions in the purchase flow.[4]

31.    Accordingly, "buyers may be hurt" because "[w]hen there is uncertainty over possible drip prices . . . consumers more frequently fail to identify the cheapest offer."[5]

32.    In fact, studies show that "consumers exposed to drip pricing . . . are significantly more likely to 1) initially select the option with the lower base price, 2) make a financial mistake

---

[3] Mary W. Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, Bureau of Economics Fed. Trade Comm'n (Jan. 2017), at 16–17, *available at* https://www.ftc.gov/system/files/documents/reports/economic-analysis-hotel-resort-fees/p115503_hotel_resort_fees_economic_issues_paper.pdf.

[4] Alexander Rasch et al., *Drip Pricing & Its Regulation: Experimental Evidence*, 176 J. Econ. Behavior & Org. 353 (2020), *available at* https://www.sciencedirect.com/science/article/abs/pii/S0167268120301189 ("[B]uyers . . . . based their purchase decision exclusively on the base price[.]").

[5] *Id.*

by ultimately selecting the option that has a higher total price than the alternative option, given the add-ons chosen, and 3) be relatively dissatisfied with their choice."[6]

33.    As the FTC's Bureau of Economics has explained, the use of deceptively low prices at the outset of transactions while hiding junk fees until the end of the transaction adds steps to the process of determining the actual price of a good or service, which forces consumers to pay more than they would if initially presented with full, complete prices.[7]

34.    As a result, when they reach the end of the transaction after they have already factored the low price into their decisions and built purchasing commitment as they clicked through the process, consumers are forced either to "incur higher total search and cognitive costs or to make an incomplete, less informed decision that may result in a more costly [purchase], or both."[8]

35.    The FTC has thus characterized junk fees as especially egregious when they are hidden (i.e., "disclosed only at a later stage in the consumer's purchasing process or not at all"), because openly disclosed junk fees would enable consumers to determine that the cost of a given product or service is not favorable relative to the cost charged by competitors and choose to do business elsewhere.[9]

---

[6] Shelle Santana et al., *Consumer Reactions to Drip Pricing*, Marketing Science (forthcoming), at 4, *available at*                        https://business.columbia.edu/sites/default/files-efs/pubfiles/26100/Santana%20Dallas%20Morwitz%20Marketing%20Science%20forthcoming.pdf.

[7] Sullivan, *Economic Issues: Economic Analysis of Hotel Resort Fees*, *supra* n.3 at 2–3.

[8] *Id.* at 4; *see also* David Adam Friedman, *Regulating Drip Pricing*, 31 Stan. L. & Pol'y Rev. 51, 67 (2020) ("[S]ellers provide buyers with the 'initial value' in the form of the initially-presented base price. . . . Buyers are influenced by the initial value, so a lower base price would create the impression of a lower overall price." (citing Gorkan Ahmetoglu *et al.*, *Pricing Practices: A Critical Review of their Effects on Consumer Perceptions and Behaviour*, 21 J. Retailing & Cons. Services 696, 697 (2014))).

[9] *See, e.g.*, *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011* ("After a market leader took unilateral action to phase out hidden fees, the platform 'lost significant market share and abandoned the policy after a year because consumers perceived the platform's advertised prices to be higher than its competitors' displayed prices.'" (citation omitted)).

36.     In many instances, companies keep the advertised price at the outset artificially low and pass some of the cost of the item into the junk fee that consumers do not see until the end, instead of adding the increased cost of the item to the low advertised price at the outset, which would deter consumers from being lured into the purchase flow. This allows companies to compound the benefit they obtain through these practices by increasing junk fees at a higher rate than they increase the base price of the underlying product or service itself.[10] As a result, the product or service appears cheaper to consumers than competitors' products or services, even though the total cost of the product or service, inclusive of junk fees, is equally, if not more, expensive than those other companies' products or services.[11]

37.     Companies are also able to increase hidden junk fees without suffering meaningful market consequences.[12] In particular, companies can charge excessive junk fees in part because drip pricing impedes fair, honest, and free market competition as they are not adequately disclosed alongside the base price.[13]

38.     Hence, by using a deceptively low price while hiding the true cost of items inclusive of junk fees, companies can charge excessive junk fees while skirting economic consequences, as shrouding the fee encourages consumers to make their purchasing decisions based on only the base price, not inclusive of junk fees.

39.     Meanwhile, competitor companies and consumers face the consequences. Companies that advertise deceptively low advertised prices that do not include hidden junk fees

---

[10] *Id.*
[11] *See id.*
[12] Rasch. *Drip Pricing & Its Regulation: Experimental Evidence*, *supra* n.4.
[13] *Id.* ("[F]irms fiercely compete in base prices but not in drip prices," so "total price increases when firms use drip pricing").

will lure consumers away from properly behaving competitors that do not engage in such practices (and thus appear to charge higher prices) and will earn more profit than those competitors.[14]

40.    Using deceptively low prices and then later adding hidden junk fees also generates significant burden for individual consumers, who "pay upward of twenty percent more [when a company engages in drip pricing] than when the actual price was disclosed upfront."[15]

41.    Moreover, the conduct of drip pricing runs afoul of the FTC Act itself. *See* 15 U.S.C. § 45(a)(1) (declaring unlawful "unfair or deceptive acts or practices in or affecting commerce").

42.    FTC's guidance on bait and switch advertising has long stated that "[n]o statement . . . should be used in any advertisement which creates a false impression of the . . . value . . . of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, the purchaser may be switched from the advertised product to another." 16 C.F.R. § 238.2(a).

43.    Mandatory Added Fees like those charged by Ticketmaster are called "junk fees" by the FTC.[16]

44.    More recently, the FTC's Trade Regulation on Unfair or Deceptive Fees, set to take effect in May 2025, "specifies that it is an unfair and deceptive practice for businesses to offer, display, or advertise any price of live-event tickets . . . without clearly, conspicuously and

---

[14] *Id.* ("[W]here there is uncertainty about the drip size, sellers with a high drip-price limit can earn profits above the competitive level.").

[15] *See Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, *supra* n.9 (explaining that hidden junk fees therefore "impose substantial economic harms on consumers").

[16] As defined by the FTC, "junk fees" are "unfair or deceptive fees that are charged for goods or services that have little or no added value to the consumer including goods or services that consumers would reasonably assume to be included within the overall advertised price" or fees that are "hidden," such as those "disclosed only at a later stage in the consumer's purchasing process or not at all." *Unfair or Deceptive Fees Trade Regulation Rule Commission Matter No. R207011*, 87 Fed. Reg. 67413 (proposed Nov. 8, 2022) (to be codified at 16 C.F.R. pt. 464), *available at* https://www.federalregister.gov/documents/2022/11/08/2022-24326/unfair-or-deceptive-fees-trade-regulation-rule-commission-matter-no-r207011 (cleaned up).

prominently disclosing the total price," authorizing the FTC to seek civil penalties against companies that violate the FTC Act in this way.[17]

45.      The FTC has sought to regulate undisclosed junk fees, particularly in the live event ticket industry. On January 10, 2025, the FTC proposed a rule that would regulate "drip pricing" and other similar impositions of unfair and deceptive fees and conduct.[18] This new rule will go into effect on May 12, 2025. 16 C.F.R. Part 464 (Vol. 90, No. 6) (Jan. 10, 2025) (available at https://www.govinfo.gov/content/pkg/FR-2025-01-10/pdf/2024-30293.pdf)  ("Trade  Regulation Rule On Unfair Or Deceptive Fees").

46.      Advertising an artificially low price at the outset to lure consumers into the transaction while adding on exorbitant and variable junk fees at the very end is bad for consumers, is bad for competition, and is an unfair and deceptive practice. The Mayland Legislature agreed, and banned the practice as to Maryland residents.

**B.  The Ticketmaster Website and Ticketmaster App.**

47.      As explained in greater detail below, Ticketmaster advertises an artificially low price, then uses partitions, a countdown clock, and urgent pop-up warnings in its purchase flow to pressure users to pay added junk fees at the end of the transaction. These junk fees are nothing more than a way to pad Defendants' bottom line. In fact, Live Nation "expect[s] that revenue from primary ticketing services, which consists primarily of our portion of per ticket convenience charges and per order service fees, will continue to comprise the substantial majority of our

---

[17]  21 FTC, "Trade Regulation Rule on Unfair or Deceptive Fees" Summary, *available at* https://www.federalregister.gov/documents/2025/01/10/2024-30293/traderegulation-rule-on-unfair-or-deceptive-fees.

[18]    https://www.federalregister.gov/documents/2025/01/10/2024-30293/trade-regulation-rule-on-unfair-or-deceptive-fees.

Ticketing segment revenue."[19] Ticketmaster further confesses, "[r]evenue from our ticketing operations primarily consists of service fees charged at the time a ticket for an event is sold."[20]

48.    Ticketmaster's pricing strategy is entirely optional. As Live Nation itself represented to the FTC, it is entirely feasible for Ticketmaster to display the full price of tickets up front, and consumers "want to know the all-in price at the outset of their search." Live Nation Comment    to    Proposed    Rule,    FTC-2023-0064-3306    (Feb.    7,    2024), https://www.regulations.gov/comment/FTC-2023-0064-3306.

49.    As detailed herein, Ticketmaster uses a deceptive purchase flow that emphasizes an artificially low price that does not include fees at the outset of the transaction. After Ticketmaster lures consumers in with artificially low prices that do not include fees, Ticketmaster's purchase flows then require customers to complete their transactions while under the pressure of a countdown clock. If the clock runs out, the consumer loses the tickets she was trying to purchase and must begin the transaction from the beginning.

50.    Throughout most of the transaction, Ticketmaster advertises artificially low ticket prices that do not include Ticketmaster's fees because Defendants know (i) that consumers will focus only on the deceptively low initial price and (ii) that consumers will then buy more tickets and tickets at higher prices than they would have if the fees had been displayed throughout the transaction.[21]

### C.  Ticketmaster's deceptive purchase flow.

51.    Ticketmaster could list the total price of the ticket at the inception of the process but affirmatively chooses not to. There can be only one reason for doing so: to give the impression

---

[19] *Id*. at 14.
[20] *Id*. at 46.
[21] *See* Tom Blake et al., *Price Salience and Product Choice*, 40 Marketing Science 4, pp. 619–36 (July-Aug. 2021), *available at https://faculty.haas.berkeley.edu/stadelis/AIP.pdf (last visited Mar. 24, 2025)*.

that the ticket price is lower than it actually is. Maryland's and other states' legislatures have recognized this and specifically banned this practice.

52.    When Ticketmaster's purchase flow uses an artificially low price at the outset that does not include Mandatory Added Fees until the end of the transaction, consumers are drawn into the purchase flow by that deceptively low price. Consumers then only have the artificially low advertised price to factor into their decision making while they must click through multiple screens under the pressure of a countdown clock—before they find out the true price inclusive of exorbitant Mandatory Added Fees.

53.    The following example shows a search that took place online from an IP address in Maryland for an event set to occur at a venue in Washington, D.C. In this example, even though Ticketmaster itself acknowledges that Maryland is a state where the true cost should be revealed at the outset, Ticketmaster displays a deceptively low ticket price without fees through several stages of the transaction.

54.    First, as shown in the example below, after the user, who was shopping on www.ticketmaster.com while sitting in Maryland, identified an event out-of-state, in this case the District of Columbia, the Ticketmaster website displays deceptively low ticket prices that do not include added fees. Alongside the specific seats that are available, Ticketmaster lists the price of each ticket. _Nothing_ on the screen indicates that customers will be charged Mandatory Added Fees.



55.     Second, after the consumer selects the specific tickets they wish to purchase based on the price information, Ticketmaster advertises the deceptively low "SUBTOTAL" price of the tickets in bold near the "Next" button without including fees. Again, nowhere does Ticketmaster mention that an exorbitant Mandatory Added Fees will be tacked on to the total price at the end.



56.    While Ticketmaster includes a bold Subtotal that emphasizes the deceptively low price that does not include added fees, in smaller font above the bolded subtotal, Ticketmaster mentions for the first time, that the price is "+ Fees." The problem is that Ticketmaster still intentionally avoids listing the actual added junk fee amount even though it obviously could; so, while users may have some idea that a fee may apply, they still have no numerical information to factor into their purchasing decision. Instead, because there is no indication of the amount of the fees Ticketmaster will charge, the nature of the fees, or whether they are government mandated,

users continue to use the deceptively low advertised price that does not include fees to make their purchasing decision as they click through Ticketmaster's pressured purchase flow.

57.    Even if the consumer clicks on the "+ Fees" link, Ticketmaster still does not state the amount of the fees that will be added. Thus, even those that clicked this link still anchor their decision-making on the only price available to them—the deceptively low price that does not include Mandatory Added Fees. Instead of revealing the amount that will be charged in fees, when users click on the link, Ticketmaster redirect the customer to a webpage purportedly explaining how ticket prices and fees are determined.[22] But that webpage does not indicate the amount of the Mandatory Added Fees Ticketmaster will charge (even though that information is known to Ticketmaster), the nature of the fees that will be charged on the specific tickets the customer has selected, or whether the Mandatory Added Fees are government mandated.

---

[22] "How Are Ticket Prices & Fees Determined?" *Ticketmaster* (last accessed March 10, 2025), *available at* https://help.ticketmaster.com/hc/en-us/articles/9663528775313-How-are-ticket-prices-and-fees-determined.



## BUY TICKETS

Presales, Payment details and Hotel Packages

**BUY TICKETS**    MY TICKETS    RESALE    TICKET DELIVERY    TRANSFER TICKETS    REFUNDS & ›

# How are ticket prices and fees determined?

There are two main types of tickets sold on Ticketmaster — standard admission tickets and resale tickets. How ticket prices and fees are determined depends on the type of ticket you're purchasing.

When it comes to standard tickets: artists, promoters, sports leagues, or teams decide how they want to sell their tickets on Ticketmaster's marketplace. That includes setting the face value prices, determining how many tickets to sell, and when to put them on sale.

For resale tickets: the listing price is determined by the seller, which includes fans, season ticket holders, and professional resellers. Often a resale price exceeds the initial face value set by the artist or team.

In any case, ticket fees (which can include a service fee, order processing fee, and the occasional delivery fee) are determined by and shared between the parties who have a hand in making live events happen including venues, Ticketmaster, sports teams, leagues and promoters.



58.    After the consumer presses "Next" on the pop-up screen, Ticketmaster redirects the customer to a "Sign In" page. The Sign In page is yet another barrier that causes users to further commit to the purchase as they enter information before they ever learn the true cost of the tickets inclusive of junk fees. In that regard, the customer must sign in to her Ticketmaster account or create an account before being able to finalize the purchase.



59.     To make matters worse and to add pressure to further interfere with user decision-making, in the upper right corner of the "Sign In" page, Ticketmaster includes a countdown clock. The approximately eight-minute countdown clock adds pressure designed to interfere with consumers' decision making and ensures that users are rushed to complete the purchase—despite

the exorbitant Mandatory Added Fees tacked on at the end of the transaction after consumers are well down the path to purchase. And, in some instances, if the consumer does not immediately complete the purchase, another pop-up informs the consumer: "Tickets are selling fast. Get yours now before they're gone."



60.     After signing into or creating a Ticketmaster account, finally, Ticketmaster redirects the consumer to the final "CHECKOUT" screen. The clock, which began to run on the

"Sign In" screen, continues to countdown the remaining time. On the "CHECKOUT" screen, Ticketmaster displays the full price of the selected ticket for the first time.

61.     In the image above, a customer who had previously selected two tickets advertised at $79.50 each (or $159.00 together) is presented with a screen depicting the "TOTAL." The total price for the two tickets after Ticketmaster has tacked on Mandatory Added Fees is $209.60.

62.     And even still, Ticketmaster keeps its Mandatory Added Fees hidden as it discreetly tucks them into the final price without breaking down the total fee amount that has been added. In other words, Ticketmaster has done nothing on this screen to indicate that Mandatory Added Fees have been tacked onto the final price and does not break down the total price to state that $50.60 in fees have been added to the $159.00 purchase. Instead, as shown below, users must click a dropdown arrow to find the breakdown of the Mandatory Added Fees that Ticketmaster added to the initially advertised low price. For the first time in the transaction, and only if users click the dropdown menu, Ticketmaster lists various Mandatory Added Fees, including a "Service Fee" and an "Order Processing Fee." The fees total $44.60 and $6.00, respectively. In the foregoing example, these Mandatory Added Fees increased the advertised price by 32% or $50.60 for the single transaction.



63.     To ensure that users cannot fully consider this information or factor it into their decision, while the consumer reviews this information (seeing the full price for the first time), the countdown clock continues to tick. In the approximately eight minutes the countdown clock runs, customers (1) sign into sign up for a Ticketmaster account, (2) must review all of the information on the "CHECKOUT" screen regarding fees and add-on items, such as parking, ticket insurance, and donations, (3) are expected to read and agree to Defendants' "Terms of Use," which, if printed

on standard 8.5"x11" paper would total 23 pages, and (4) must understand the increase in the cost of their tickets.

64.      If a customer is not able to understand why the cost of the selected tickets increased within the eight-minute countdown, the tickets become "expired," and the customer must start over. For example, in the screenshot below, a customer who failed to purchase the selected tickets for $209.60 within the countdown clock faces a pop-up notification stating "Time's Up. Your time limit to secure these tickets has expired. You will need to select new tickets to purchase."



**D. Ticketmaster uses All-In Pricing For Events in Some States But Still Fails to Properly Disclose all Mandatory Added Fees.**

65.    Defendants decide whether to use their deceptive initial low pricing practices based on where the event is occurring, not based on where the consumer is purchasing tickets.[23] Thus, for the example above, every consumer in Maryland and Washington, D.C. would see the same partitioned prices for the event that is taking place in Washington, D.C.

66.    As another example, to consumers throughout the country, Ticketmaster advertises the possibility of booking a ticket to see the Baltimore Orioles play at Oriole Park at Camden Yards in Baltimore, Maryland on April 16, 2025 for as low as $13.53.

67.    Ticketmaster notifies consumer that it is using All-In Pricing for the event, which means that "you'll see the cost of the ticket up front, including fees (before taxes)."

---

[23]    "All-In Pricing: What it Means," Ticketmaster (Feb. 11, 2025), *available at* https://blog.ticketmaster.com/all-in-pricing-explained/ ("Some states have started to pass laws requiring all-in pricing, so any events in New York, Tennessee, Connecticut, California, Maryland, Minnesota, North Carolina, Colorado and Massachusetts automatically have all-in pricing shown.").



68.     On the screen to select tickets for this event, hundreds of tickets are displayed with the lowest price totaling $13.53. Above the hundreds of ticket listings there is small print that states "[p]rice includes fees (before taxes if applicable). An order processing fee of up to $3.95 may be added to each order."



69.    After selecting the $13.53 ticket, the next screen identifies a subtotal of $31.01 (for

two tickets) with the Mandatory Added Fees partitioned. After opening the partitioned Mandatory

Added Fees, Ticketmaster identifies that the face value of the two tickets cost $22.00 ($11.00 per

ticket), the service fee for two tickets costs $5.06 ($2.53 per ticket), and the order processing fee

costs $3.95.



70.     Underneath the "Next" button, Ticketmaster states "[a]pplicable taxes may be added to your order at checkout."

71.     On the Place Order page, the Total for the two tickets jumps up again to $34.12 when Ticketmaster tacks on an additional $3.11 in taxes for the two tickets.



72.     After going through the same checkout process outlined above, the price of the "$11.00" ticket becomes $17.06 per ticket after adding $6.06 in Ticketmaster's Mandatory Added Fees and taxes. This equates to an increase of 55% from the $11.00 "face value" ticket price. Again, regardless of from where the consumer is completing the transaction, Ticketmaster knowingly advertises the lowest-priced tickets as $13.53 when the face value of the ticket is $11 and after all Mandatory Added Fees and taxes the total is $17.06 per ticket.

73.     By deciding whether to use drip pricing based on where the event is occurring, then using the same drip-pricing practices throughout the country, Ticketmaster continues to use drip pricing in jurisdictions that have hidden fee laws.

74.     For example, Ticketmaster failed to disclose all Mandatory Added Fees in the initial step of her transaction when Plaintiff Holmes purchased tickets for an event in Virginia from her home in Maryland despite Maryland's law prohibiting drip-pricing.

75.     And again, Ticketmaster failed to disclose all Mandatory Added Fees in the initial step of transactions taking place in Maryland regardless of where the purchaser was located despite Maryland's law prohibiting drip-pricing.

76.     Moreover, prior to adopting the All-In pricing model for Maryland events, Ticketmaster disclosed tickets as they currently do in Washington, D.C.

77.     As shown by the foregoing examples, Ticketmaster's deceptive purchase flow takes advantage of consumers' known focus on the artificially low initially advertised price that does not include fees. By including the countdown timer, Ticketmaster effectively prevents consumers from comparing prices across different platforms and making an informed choice about where to purchase their tickets. Indeed, Ticketmaster uses these deceptive tactics to ensure that consumers become invested in the decision to buy and get swept up in the momentum of events such that consumers still make the purchase on Defendants' platform, even as they add hefty fees at the very end of the transaction. In other words, Ticketmaster employ deceptive and unfair "digital dark patterns" that have the effect of obscuring, subverting, and impairing consumer autonomy and decision-making in purchasing tickets, resulting in harm to consumers.[24]

---

[24] Fed. Trade Comm'n, *Bringing Dark Patterns to Light*, Staff Report (September 2022), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf (finding that "[s]ome dark patterns manipulate consumer choice by inducing false beliefs", including

**E. Ticketmaster's purchase flow is designed with dark patterns to interfere with consumer decision making to ensure reliance on the deceptively low advertised price.**

78.    Ticketmaster uses "dark patterns" to ensure that when users reach the final screen the momentum of events will pressure consumers to purchase despite the addition of exorbitant fees to the total price of the tickets. *Veera v. Banana Republic, LLC*, 211 Cal. Rptr. 3d 769, 778 (Cal. Ct. App. 2016) ("In short, plaintiffs had a legally protected interest in knowing from the outset, when they started to shop, the true prices of the items they chose to buy."). Ticketmaster's dark patterns ensure that users have already decided to buy tickets based on the artificially low price advertised at the outset and throughout the transaction even though the true cost has been revealed to as a much higher amount. Ticketmaster's dark patterns—online practices that trick or manipulate consumers into making choices that they would not have otherwise made—include:

a. **Scarcity**: Ticketmaster creates pressure to purchase by creating a false sense of high demand when it includes filler pages that state that the event is selling fast, is likely to sell out, is the last ticket remaining in a particular section, and/or how many users purportedly viewed the ticket in the last hour;

b. **Urgency**: Ticketmaster also ensures that consumers complete their purchase at the end of the transaction despite the increased price with added fees by creating a false sense of urgency with a countdown clock that ticks down throughout the transaction. Ticketmaster also uses pop up warnings to suggest tickets are "selling fast" if users so much as pause on a page in the transaction;

c. **Obstruction**: Ticketmaster stops users from comparing prices because the overall amount is hidden behind multiple stages of the transaction, including after the consumer has provided personally identifying information;

d. **Information Hiding**: Ticketmaster hides the true price of the tickets until users have built purchasing commitment through multiple steps in the transaction, finally disclosing the true price by adding opaquely denominated "fees." Even after getting to

---

the use of "countdown timers on offers that are not actually time-limited, claims that an item is almost sold out when there is actually ample supply, and false claims that other people are also currently looking at or have recently purchased the same product."); *see also id.* at 9 ("Drip pricing interferes with consumers' ability to price-compare and manipulates them into paying fees that are either hidden entirely or not presented until late in the transaction, after the consumer already has spent significant time selecting and finalizing a product or service plan to purchase.").

the final page, the amount of fees is hidden in a dropdown list that is only visible if the consumer inquires as to the change in price;

e. **Interface Interference**: Ticketmaster uses style and design, including a clock that pops up and greys out a page if a user pauses long enough to read it and dropdown lists, to distract and misdirect attention from the true amount of fees disclosed only at the very end of the transaction;

f. **Coerced Action**: Ticketmaster forces registration prior to disclosing the true cost of tickets by requiring users to provide contact information and to sign in or sign up, further inhibiting consumers' ability to price compare.

79.    Ticketmaster's use of dark patterns has benefited them through the collection of inadequately disclosed fees and has deprived consumers of the ability to make informed purchasing decisions.

80.    Adding to the confusion, there does not appear to be any standardization for how the Mandatory Added Fees are set. The Order Processing Fee, Facility Charge, Service Fee, and Taxes can vary depending on the ticket price, event, and location and have no known discernable formula.

81.    In some instances, the cost of the Mandatory Added Fees is greater than the face value of the ticket purchased. Thus, even a repeat consumer cannot anticipate the amount of the fees that Ticketmaster will add to the advertised cost prior to checkout.

**F. Defendants know their practice of hiding fees induces consumers to buy more tickets and to buy tickets at higher prices.**

82.    The deceptive conduct described above was by design, as Defendants implemented it to pad their profits at the expense of consumers. Independent testing has shown that when consumers purchasing live-event tickets are presented with an all-in price including fees or initially presented a lower ticket price with mandatory fees added later in the transaction, consumers consistently spend more under the drip pricing sales tactic.

83.     In a peer-reviewed industry study, a competitor performed testing to determine whether customers spent more when it used an "up front-fee (UF) strategy, where the site showed consumers the final price, including fees and taxes, from their very first viewing of ticket inventory" or "a back-end-fee (BF) strategy, where mandatory fees were shown only after consumers had selected a particular ticket and proceeded to the checkout page."

84.     The results of that study confirmed that consumers buy more tickets and at higher prices when fees are not disclosed until the end. That is, published consumer research based on this "A/B" testing confirmed that, when the competitor displayed the true price of the ticket with fees at the outset, consumers were dissuaded from purchasing tickets compared to when fees were hidden until the end of the transaction.[25]

85.     The study, which was published in a leading, peer-reviewed academic publication devoted to marketing science, concluded that "disclosing fees upfront reduces both the quantity and quality of purchases."[26] It also concluded that the sequential partitioned pricing "makes price comparisons difficult and results in consumers spending more than they would otherwise."[27] As the highest volume tickets seller in the country, Defendants are likely aware of this research.

86.     Besides the independent research, the deceptive nature of Ticketmaster's hidden fees has been widely reported for years. Hundreds of articles have been written criticizing Ticketmaster for its deceptive trade practices.[28]

---

[25] Blake, *supra* n.21 at 619–36.
[26] *Id*. at 619.
[27] *Id*.
[28] *E.g.*, Ethan Millman, "FTC Cracks Down on Hidden Concert-Ticket Fees," *Rolling Stone* (Dec. 17, 2024), available at https://www.rollingstone.com/music/music-news/ftc-bans-hidden-ticket-fees-1235208143/; Natalie Sherman, "Ticketmaster Settles $6M Class Action Lawsuit Over Hidden Fees," *Lawyer Monthly* (Jan. 30, 2025), available at https://www.lawyer-monthly.com/2025/01/ticketmaster-settles-6m-class-actionlawsuit-over-hidden-fees/ (describing Defendants' six-year fight in Canadian courts for the same hidden fee practice); Joey Garrison, "Biden Muscles Ticketmaster, SeatGeek to Scrap Hidden Ticket Fees After Taylor Swift Debacle," USA Today (June 15, 2023), available at https://www.usatoday.com/story/news/politics/2023/06/15/live-nation-seatgeekscrap-hidden-fees-

87.    Moreover, since the enactment of several hidden fee laws across the country, Ticketmaster has begun using "All-In Pricing" in some states and for some events.[29] According to Ticketmaster, All-In Pricing "means [customers will] see the cost of the ticket up front, including fees (before taxes)." This statement turns out to be false.

88.    Yet despite being aware of various laws declaring the drip-pricing practices they use as deceptive; Ticketmaster continues to advertise artificially deflated ticket prices regardless of where the consumer purchases the ticket. For example, as explained above, Maryland residents continue to pay Mandatory Added Fees for events occurring in Maryland and in other states.

89.    In a comment to the FTC's proposed rule to ban hidden fees, Live Nation wrote:

> It is, of course, possible to communicate the true price of a ticket with a "face value" amount and conspicuous disclosures of fees. But why should it be any work at all for a consumer to see the all-in price?
>
> **Technologically, it is no more difficult for the ticketing company to show the all-in price throughout the shopping and purchasing experience than it is to show it only at checkout.** And while the distinction between face value and fees is real and important among those who collaborate to put on live entertainment events, consumers just want to know how much it will cost to see the show or game. They want to know the all-in price at the outset of their search.
>
> . . .
>
> With all-in pricing, the first price fans see should be the price they pay. In other words, fans can see upfront the full ticket price, inclusive of all mandatory fees, from the first time a fan sees a ticket. **This practice allows consumers to comparison shop with greater ease and certainty, eliminating the surprise of added fees when the consumer proceeds to the ticket purchase page.**

---

amid-pressure-from-biden/70319147007/; Mark Dent, "The Sneaky Economics of Ticketmaster," *The Hustle* (Dec. 11, 2022), available at https://thehustle.co/the-sneaky-economics-of-ticketmaster.
    [29] "All-In Pricing: What it Means," Ticketmaster (Feb. 11, 2025), *supra* n.23 (but even with All In Pricing, Ticketmaster still adds additional fees to the transaction after an initial step; including events taking place in Maryland).

. . .

> **In many instances, deferring disclosure of mandatory fees is inherently deceptive or unfair.** As explained in Live Nation's 2020 Congressional testimony, some marketplaces take advantage of disclosing the fees later in the purchasing process to deceive customers by manipulating the list price of a ticket, making the ticket price appear less expensive upfront. These marketplaces represent to consumers the price of a ticket that is intentionally reduced, only to add the amount of the reduction (or more) into the fees charged later in a transaction.

Live Nation Comment to Proposed Rule, FTC-2023-0064-3306 (Feb. 7, 2024) (emphasis added, footnote omitted).

90.    Live Nation was clear that there is no technological barrier preventing Ticketmaster from showing consumers the full price of live event tickets from the beginning of the transaction.

91.    Instead, Live Nation explained that "[i]f Ticketmaster implements all in pricing but other ticketing marketplaces do not, it risks losing site traffic and, ultimately, sales because such other platforms can list a lower price upfront to draw in consumers, even if their final price once fees are added is higher than the price offered by Ticketmaster."

92.    Defendants thus recognize (1) that the artificially low price advertised at the start of the transaction is deceptive, (2) that it is no more difficult to show the full ticket price to consumers from the beginning, and (3) that it is better for their bottom line to continue using dark patterns to interfere with consumer decision making.

**F. Plaintiff's Experience**

93.    Named Plaintiff Holmes experienced the same unfair and deceptive purchase flow as every other Class Member during her Ticketmaster purchase.

94.     On November 23, 2024, Named Plaintiff Holmes purchased two (2) tickets for a live event in Virginia from her home in Maryland from Ticketmaster.

95.     The purchase totaled two hundred seventy-nine dollars and forty-five cents ($279.45).

96.     Ticketmaster did not initially advertise a price that included all Mandatory Added Fees.

97.     Ticketmaster initially advertised the two tickets as costing one hundred thirteen dollars ($113) per ticket ($226 in total).

98.     After Named Plaintiff selected the $113 tickets and Named Plaintiff progressed through to a non-initial step in the transaction, Ticketmaster tacked on several Mandatory Added Fees including a service fee of eighteen dollars ($18) per ticket ($36 in total) and an additional order processing fee of one dollar and fifty cents ($1.50).[30]

99.     Named Plaintiff Holmes was not aware that the two tickets included thirty-seven dollars and fifty cents ($37.50) in Mandatory Added Fees when she first selected the tickets.

100.    The deceptively low initially advertised price of $113 was a substantial factor in Named Plaintiff Holmes' decision to purchase the tickets.

101.    As a result of the pressure exerted by Ticketmaster in its purchase flow as described herein, Named Plaintiff Holmes purchased the tickets despite the previously undisclosed Mandatory Added Fees.

**V.     CLASS ACTION ALLEGATIONS**

---

[30] Named Plaintiff also purchased a parking pass for fifteen dollars ($15) and was assessed a service fee of ninety-five cents ($0.95) in a non-initial step in the transaction.

102.    Named Plaintiff brings Count I on behalf of the proposed class consisting of the following individuals:

> All residents of Maryland who, during the Class Period, paid a Mandatory Added Fee through the Ticketmaster Website or Ticketmaster App where the price initially displayed did not include the amount of the Mandatory Added Fee.

Named Plaintiff also brings Count II on behalf of the proposed subclass consisting of the following individuals:

> All residents of Maryland who, on or after July 1, 2024, paid a Mandatory Added Fee through the Ticketmaster Website or Ticketmaster App where the price initially displayed did not include the amount of the Mandatory Added Fee.

> Excluded from the Class are those individuals: (a) who now are or have ever been Ticketmaster executives and the spouses, parents, siblings and children of all such individuals; (b) persons who properly execute and file a timely request for exclusion from the class; (c) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (d) Plaintiffs' counsel and Ticketmaster's counsel, and their experts and consultants; and (e) the legal representatives, successors, and assigns of any such excluded persons.

103.    The Class, as defined above, is identifiable. Named Plaintiff is a member of the Class.

104.    The Class consists, at a minimum, of fifty (50) persons and is thus so numerous that joinder of all members is clearly impracticable.

105.    There are questions of law and fact which are not only common to the Class but which predominate over any questions affecting only individual class members.

106.    The common and predominating questions include, but are not limited to:

    a.    whether Ticketmaster misrepresented the total cost of the tickets to Class members;

    b.    whether Ticketmaster omitted material pricing information from the advertised prices of tickets;

    c.   whether Ticketmaster's marketing, advertising, and/or selling of the tickets with misrepresentations constituted unfair and/or deceptive trade practices;

    d.   whether Ticketmaster violated MCPA;

    e.   whether Ticketmaster failed to disclose the total amount, including all fees, it would be charging class members during the initial step of the ticket purchasing transaction;

    f.   whether Ticketmaster made false and misleading statements of fact concerning the price of its tickets and ticketing selling services;

107.    Claims of Named Plaintiff are typical of the claims of the Class Members and are based on and arise out of similar facts constituting Ticketmaster's wrongful conduct.

108.    Named Plaintiff will fairly and adequately protect the interests of the Class and Subclass.

109.    Named Plaintiff is committed to vigorously litigating this matter.

110.    Named Plaintiff has secured counsel experienced in handling consumer class actions and complex consumer litigation.

111.    Neither Named Plaintiff nor her counsel have any interests which might cause them not to vigorously pursue this claim.

112.    The common questions of law and fact enumerated above predominate over questions affecting only individual Class Members.

113.    A class action is the superior method for fair and efficient adjudication of the controversy.

114.    The likelihood that individual Class Members will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

115.    The likelihood that individual Class Members will prosecute separate actions is remote also because each individual claim involves a relatively small amount.

116.    Counsel for Named Plaintiff and the Class are experienced in class actions and foresee little difficulty in the management of this case as a class action.

**VI.    CAUSES OF ACTION**

<u>**COUNT I**</u>
**(Violation of the Maryland Consumer Protection Act)**
**(Class)**

117.    Named Plaintiff incorporates each and every paragraph set forth above.

118.    Defendant has violated the MCPA.

119.    MCPA prohibits unfair, abusive, or deceptive trade practices. MCPA, § 13-301.

120.    Defendant is a "merchant," under the MCPA. MCPA, § 13-101(g)(1).

121.    A "merchant" means a "person who directly or indirectly either offers or makes available to consumers any consumer goods[ or] consumer services[.]" *Id.*

122.    Named Plaintiff and all Class members are "[c]onsumer['s.]" MCPA, § 13-101(c)(1).

123.    "Consumers" include any "actual or prospective purchaser, lessee, or recipient of consumer goods, consumer services, consumer realty, or consumer credit."

124.    "Consumer goods" and "[c]onsumer services" include "goods" and "services which are primarily for personal, household, family, or agricultural purposes."

125.    A "Ticket issuer" is a "merchant" under the MCPA.

126.    A "Ticket" is "[c]onsumer goods" or "[c]onsumer services" under the MCPA.

127.    Defendant's users receive consumer goods (tickets to live events) and services (access to live events, as well as a marketplace to purchase tickets to live events) for personal, household, or family uses and are therefore are consumers under the MCPA.

128.    The MCPA prohibits misleading and deceptive trade practices in connection with the offer, sale, and supply of consumer goods and services.

129.    Under the MCPA, "unfair, abusive, or deceptive trade practices" include:

a.    "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;" (§ 13-301(1));

b.    Representations that "[c]onsumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;" (§ 13-301(2)(i));

c.    "[f]ailure to state a material fact if the failure deceives or tends to deceive;" (§ 13-301(3));

d.    advertisement of consumer goods "[w]ithout intent to sell, lease, or rent them as advertised or offered;" (§ 13-301(5)(i)); and

e.    "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he promotion or sale of any consumer goods, consumer realty, or consumer service[.]" (§ 13-301(9)(i)).

130.    Defendant has engaged in misleading and deceptive trade practices in violation of the MCPA, by:

a. Advertising ticket prices that do not include Ticketmaster's mandatory fees;

b. Failing to adequately disclose material information to consumers concerning the true price of the tickets;

c. Failing to adequately disclose the amount of the fees at the outset of the transaction, which constitutes an ambiguity as to material facts that have the tendency to mislead and are deceptive trade practices;

d. Advertising or offering goods or services without the intent to sell them at the advertised price;

e. Affirmatively misrepresenting the nature and purpose of its mandatory fees, and failing to adequately disclose and making ambiguous statements regarding how its mandatory fees are calculated and what they are used for.

131.    Defendant's misleading acts or practices harmed Class members who have all lost money in the amount of the undisclosed portion of the total ticket price.

## COUNT II
**(Violation of the Maryland Consumer Protection Act)**
**(Subclass)**

132.    Named Plaintiff incorporates each and every paragraph set forth above.

133.    MCPA prohibits generally any "[v]iolation of a provision of: (i) [t]his title. MCPA, § 13-301(14)(i).

134.    The Maryland General Assembly amended the MCPA by adding § 13-310.1 with an effective date of July 1, 2024.

135.    As of July 1, 2024, the MCPA explicitly prohibits "drip pricing" in any ticket sale by "secondary ticket exchanges, ticket issuers, and resellers" and enumerates specific forms of disclosures throughout the ticket purchasing transaction. MCPA, § 13-310.1(b).

136.    Ticketmaster is a "ticket issuer[,]" a "secondary ticket exchange[,]" and a "reseller" under the MCPA. MCPA, § 13-310.1(a)(3), (a)(4), (7)(i).

137.    A "Ticket" is "[c]onsumer goods" or "[c]onsumer services" under the MCPA.

138.    Defendant's users receive consumer goods (tickets to live events) and services (access to live events, as well as a marketplace to purchase tickets to live events) for personal, household, or family uses and are therefore are consumers under the MCPA.

139.    MCPA requires that any ticket listing "and each step of a transaction to purchase a ticket" to "disclose the total price of the ticket, including all fees and taxes[.]" MCPA, § 13-310.1(b)(2)(i).

140.    MCPA also requires that any ticket listing "and each step of a transaction to purchase a ticket" to "[p]rovide an itemized listing of all charges that comprise the total price of the ticket, including all fees and taxes[.]" MCPA, § 13-310.1(b)(2)(ii).

141.    In addition, MCPA restricts any party from increasing the "total price of a ticket . . . in a non-initial step of a transaction" except for "the amount of reasonable shipping costs for physically delivered tickets." MCPA, § 13-310.1(b)(3)(i).

142.    Ticketmaster violated MCPA by failing to disclose the "total price of the ticket" in the ticket listing or initial step of the transaction. MCPA, § 13-310.1(b)(2)(i).

143.    Ticketmaster violated MCPA by failing to itemize "all charges that comprise the total price of the ticket" in the ticket listing or initial step of the transaction. MCPA, § 13-310.1(b)(2)(ii).

144.    Ticketmaster violated MCPA by increasing the "total price of a ticket . . . in a non-initial step of a transaction[.]" MCPA, § 13-310.1(b)(3)(i).

145.    Defendant's misleading acts or practices harmed Subclass members who have all lost money in the amount of the undisclosed portion of the total ticket price.

## PRAYER FOR RELIEF

WHEREFORE, Named Plaintiff seeks the following relief for herself and the proposed Class and Subclass:

    a.   An order certifying the asserted claims, or issues raised, as a class action, appointing Named Plaintiff as Class Representative, and Plaintiff's counsel as Class Counsel;

    b.   A judgment in favor of Named Plaintiff and the proposed classes;

    c.   Actual and statutory damages;

    d.   Reasonable attorneys' fees and costs, as allowed by law;

    e.   Pre- and post-judgment interest;

    f.   Any additional relief that the Court deems reasonable and just.

## JURY TRIAL

Named Plaintiff demands the right to a jury trial on all claims so triable.


Respectfully submitted,

Z LAW, LLC

Dated: April 1, 2025          /s/Cory L. Zajdel_____
Cory L. Zajdel, Esq. (CPF #0412150442)
David M. Trojanowski, Esq. (CPF #1412180233)
2345 York Road, Suite B-13
Timonium, Maryland 21093
(443) 213-1977
clz@zlawmaryland.com
dmt@zlawmaryland.com

Oren Giskan (*pro hac vice to be filed*)
GISKAN SOLOTAROFF & ANDERSON LLP
90 Broad Street

New York, New York 10004
(212) 847-8315
ogiskan@gslawny.com

*Attorneys for Named Plaintiff*